## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| MONICA BENTZEN, CHAD R. DUBOIS, GARRETT GIBBS, JOHN HOFFPAUIR, JARED MARTINEZ, LANCE T. MENDOZA, and KENNETH D. SIMMONS III, | § § § § § § | **JURY TRIAL DEMANDED** |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 1:25-cv-00568 |
| ANESTHESIA ASSOCIATES, PA, and ANESTHESIA ASSOCIATES GROUP, PLLC, | § § § § | |
| *Defendants.* | § § | |

## COMPLAINT

Plaintiffs Monica Bentzen, Chad R. DuBois, Garrett Gibbs, John Hoffpauir, Jared Martinez, Lance T. Mendoza, and Kenneth D. Simmons III ("Plaintiffs"), by and through their undersigned counsel, bring this civil action for damages and injunctive relief against Anesthesia Associates, PA, and Anesthesia Associates Group, PLLC (collectively, "Anesthesia Associates").

## INTRODUCTION

1.      For years, Plaintiffs—seven experienced Certified Registered Nurse Anesthetists ("CRNAs")—have provided high-quality anesthesia care to patients in their home county of Jefferson County, Texas. They live in the community, have long-standing ties to its hospitals, and form the backbone of anesthesia delivery for local patients. Rather than compete for their services on the merits, Defendant Anesthesia Associates used restrictive noncompetes and legal threats to prevent these professionals from continuing to work in their home market, with the purpose and effect of illegally suppressing competition.

2.      Anesthesia Associates has been consolidating its control for decades over the provision of anesthesia services in Jefferson County, Texas. The law does not prohibit a company from succeeding as a result of superior business acumen. However, the law does prohibit a company from maintaining its market position by entering into agreements that make it impossible for employees to compete. Here, Anesthesia Associates has engaged in anticompetitive conduct to prevent competition for the sale of CRNA services in Jefferson County instead of competing on the merits.

3.      There is an extreme shortage of CRNAs nationwide, and in Jefferson County in particular, where there are only 31 licensed CRNAs, according to the Texas Department of State Health Services. Upon information and belief, Anesthesia Associates employed at least 20 of those CRNAs and, as a condition of employment, forced them to agree to non-compete clauses that prevent those CRNAs from working as CRNAs within *20 miles* for *three years* if they leave Anesthesia Associates.

4.      Anesthesia Associates consolidated its control over anesthesia services through agreements with Jefferson County hospitals, including Baptist Hospital of Southeast Texas ("Baptist") and CHRISTUS's St. Elizabeth Hospital ("St. Elizabeth"), and with independent surgery groups and surgery centers. Anesthesia services are critical to these facilities' ability to provide healthcare services in Jefferson County.

5.      Earlier this year, Anesthesia Associates decided it was not profiting enough at St. Elizabeth from its anesthesia monopoly. Anesthesia Associates decided to play "hardball" and terminated the contract with St. Elizabeth effective August 1, with the goal of negotiating a new contract for more money. Faced with unreasonably increasing anesthesia costs facilitated by Anesthesia Associates' monopoly, a looming August 1 termination date, and Anesthesia

Associates' total disregard of St. Elizabeth's attempts to negotiate a new contract, St. Elizabeth decided "enough was enough" and contracted with EmergencHealth, PLLC ("EmergencHealth")[1] to provide anesthesia services starting on August 1, 2025.

6.     EmergencHealth needed to hire CRNAs to provide anesthesia services at St. Elizabeth. Anesthesia Associates initially agreed that EmergencHealth could hire eight of the local CRNAs, seven of whom are Plaintiffs, who had been providing services at St. Elizabeth, so long as Anesthesia Associates was paid $30,000 in liquidated damages for each CRNA pursuant to the CRNAs' employment agreements. Plaintiffs entered into their employment contracts with EmergencHealth in reliance on that representation from Anesthesia Associates. However, after their contracts were signed, Anesthesia Associates reneged on that commitment and said it would not let the CRNAs out of the noncompete clauses unless EmergencHealth paid a ransom of $400,000 per CRNA. Since that time, upon information and belief, Anesthesia Associates has significantly increased the amount they are charging to let the CRNAs out of the noncompete clauses.

7.     Anesthesia Associates then went to state court and obtained temporary injunctions against Plaintiffs, effectively barring them from working in Jefferson County, where they have worked and lived with their families for years.[2]

---

[1] EmergencHealth is also known as "Essential."

[2] In the midst of the state claims Anesthesia Associates filed, EmergencHealth filed a federal lawsuit against Anesthesia Associates in this district. *See EmergencHealth, PLLC v. Anesthesia Associates*, 1:25-cv-00405-MAC (E.D. Tex.).

8.    Anesthesia Associates' conduct violates the law. Federal and state antitrust laws prohibit exclusive contracts and non-compete agreements that harm competition, like those imposed by Anesthesia Associates.

9.    Anesthesia Associates' anticompetitive conduct threatens serious public injury in the form of higher anesthesia costs and reduced competition for CRNA services and has injured the Plaintiff CRNAs in their ability to seek employment within Jefferson County. Plaintiffs seek damages, as well as preliminary and permanent injunctive relief, to remedy Anesthesia Associates' violation of the law and prevent harm to themselves and their community.

## THE PARTIES

**<u>Plaintiffs</u>**

10.    Plaintiff MONICA BENTZEN is a citizen of the State of Texas and resides in this District.

    a.    From approximately April 2022 until August 2025, Plaintiff Bentzen was a CRNA employee of Anesthesia Associates. She started working at Anesthesia Associates immediately after graduating in December 2021 from the University of Pittsburgh with her doctorate in anesthesia.

    b.    Plaintiff Bentzen decided to return to Beaumont to care for her mother, who has unique health challenges, and her 94-year-old grandmother. Plaintiff Bentzen's father passed away in September 2021, and no one else is available to provide the comprehensive long-term care that her mother and grandmother require.

    c.    On July 22, 2025, Plaintiff Bentzen signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. Plaintiff Bentzen began working for EmergencHealth. Anesthesia Associates

was aware of Bentzen's agreement with EmergencHealth and sued in state court to prevent her from providing anesthesia services in Jefferson County.

11.     Plaintiff CHAD R. DUBOIS is a citizen of the State of Texas and resides in this District.

    a.     From approximately June 2013 until August 2025, Plaintiff DuBois was a CRNA employee of Anesthesia Associates. Plaintiff DuBois began working for Anesthesia Associates immediately after graduating with his master's degree in anesthesia from Arkansas State University. His time at Arkansas State is the only time Plaintiff DuBois has lived outside of Southeast Texas.

    b.     Plaintiff DuBois does not intend to move outside of the Beaumont area. Both his and his wife's families live in the area, and he does not want to uproot his two young children.

    c.     Sometime in July or August 2025, Plaintiff DuBois signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. DuBois began working for EmergencHealth. Anesthesia Associates was aware of DuBois's agreement with EmergencHealth and sued in state court to prevent him from providing anesthesia services in Jefferson County.

12. Plaintiff GARRETT GIBBS is a citizen of the State of Texas and resides in this District.

    a.     From approximately July 2014 until August 2025, Plaintiff Gibbs was a CRNA employee of Anesthesia Associates. He began working for Anesthesia Associates immediately after graduating with his master's degree in anesthesia from Arkansas State University. Plaintiff Gibbs wanted to return home to Jefferson County and knew that that meant working for Anesthesia Associates.

b.      Plaintiff Gibbs has no intention of leaving Jefferson County. His entire extended family lives in the area, and he is the primary caregiver for his 70-year-old mother, who recently fell and broke her hip. Plaintiff Gibbs turned down several higher-paying job offers in order to return home. If he cannot work as a CRNA locally, he will seriously consider leaving the nursing profession.

c.      Sometime in July or August 2025, Plaintiff Gibbs signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. Gibbs began working for EmergencHealth. Anesthesia Associates was aware of Gibbs's agreement with EmergencHealth and sued in state court to prevent him from providing anesthesia services in Jefferson County.

13.     Plaintiff JOHN HOFFPAUIR is a citizen of the State of Texas and resides in this District.

a.      From approximately February 2015 until August 2025, Plaintiff Hoffpauir was a CRNA employee of Anesthesia Associates. Plaintiff Hoffpauir began working with Anesthesia Associates immediately after graduating with his master's degree in anesthesia from Our Lady of the Lake (later Franciscan University) in Baton Rouge, Louisiana. Because he wanted to work in Jefferson County, he knew that Anesthesia Associates was his only option.

b.      Plaintiff Hoffpauir lives in Jefferson County with his wife and child. His and his wife's families also live in Jefferson County and neighboring Orange County. He wants to continue working not just in Beaumont but at St. Elizabeth specifically. He was a nurse at St. Elizabeth before becoming a CRNA. St. Elizabeth is the hospital where he met and proposed to his wife and is the hospital he recommends to all of his loved ones. If he

6

is unable to work as a CRNA in Beaumont, Plaintiff Hoffpauir would consider non-hospital jobs if those jobs gave him a path back to working at St. Elizabeth.

      c.     On July 21, 2025, Plaintiff Hoffpauir signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. Hoffpauir began working for EmergencHealth. Anesthesia Associates was aware of Hoffpauir's agreement with EmergencHealth and sued in state court to prevent him from providing anesthesia services in Jefferson County.

14.     Plaintiff JARED MARTINEZ is a citizen of the State of Texas and resides in this District.

      a.     From approximately June 2014 until August 2025, Plaintiff Martinez was a CRNA employee of Anesthesia Associates. He began working there immediately after graduating with his master's degree in anesthesia from Arkansas State University. Because he wanted to work in Jefferson County, he knew that Anesthesia Associates was his only option.

      b.     Plaintiff Martinez returned to Beaumont to fulfill a promise to his wife: that they would return to their hometown once they had children.

      c.     On July 17, 2025, Plaintiff Martinez signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. Martinez began working for EmergencHealth. Anesthesia Associates was aware of Martinez's agreement with EmergencHealth and sued in state court to prevent him from providing anesthesia services in Jefferson County.

15.     Plaintiff LANCE T. MENDOZA is a citizen of the State of Texas and resides in this District.

a.      From approximately January 2017 until August 2025, Plaintiff Mendoza was a CRNA employee of Anesthesia Associates. He began working there immediately after graduating with his master's degree in anesthesia from Texas Wesleyan University.

b.      Plaintiff Mendoza has no intention of leaving Jefferson County. He would not ask his family to leave, so he would travel to work at other hospitals as a CRNA for the time being to avoid his income dropping and his specialized skills deteriorating. This would place an increased burden on his wife, who would be left alone to care for their two young children for days at a time.

c.      Sometime in July or August 2025, Plaintiff Mendoza signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. Mendoza began working at EmergencHealth. Anesthesia Associates was aware of Mendoza's agreement with EmergencHealth and sued in state court to prevent him from providing anesthesia services in Jefferson County.

16.     Plaintiff KENNETH D. SIMMONS III is a citizen of the State of Texas and resides in this District.

a.      From approximately June 2020 until August 2025, Plaintiff Simmons was a CRNA employee of Anesthesia Associates. He began working there immediately after graduating with his master's degree in anesthesia from Florida Gulf Coast University. Because he wanted to work in Jefferson County, he knew that Anesthesia Associates was his only option.

b.      Plaintiff Simmons has no intention of leaving Beaumont. He does not want to uproot his family, and it is important for him that his young children be close to their

8

grandparents. If he is unable to work as a CRNA in Beaumont, he would likely leave the nursing profession and join his family's real estate company.

c.    On July 17, 2025, Plaintiff Simmons signed an employment agreement with EmergencHealth to provide anesthesia services in Beaumont, Texas, including at St. Elizabeth. Simmons began working at EmergencHealth. Anesthesia Associates was aware of Simmons's agreement with EmergencHealth and sued in state court to prevent him from providing anesthesia services in Jefferson County.

**Defendants**

17.    Defendant Anesthesia Associates, PA ("AA") is a Texas professional association with its principal place of business in this District. It may be served with process through its registered agent, Stephen J. Schange, 755 N 11th St., Suite P3600, Beaumont, TX 77702.

18.    Defendant Anesthesia Associates Group, PLLC ("AA Group") is a Texas professional limited liability company with its principal place of business in this District. It may be served with process through its registered agent, Stephen J. Schange, 755 N 11th St., Suite P3600, Beaumont, TX 77702. Defendants AA and AA Group are referred to collectively herein as "Anesthesia Associates" or "Defendants."

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and under Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. This Court has exclusive jurisdiction over the claims in this case brought under the Sherman Act and Clayton Act. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper in the Eastern District of Texas because a substantial part of the acts and conduct charged herein occurred in this District. Anesthesia Associates transacts business in this District and is subject to personal jurisdiction therein.

## TRADE AND COMMERCE

21.     Anesthesia Associates is engaged in interstate commerce and their activities substantially affect interstate commerce, as a substantial portion of Anesthesia Associates' annual revenues for treatment of patients within this District come from sources located outside of Texas, including payments from Medicare and out-of-state health insurers. Defendants' conduct has resulted and will result in a substantial reduction in competition in the relevant antitrust markets described below, which will substantially affect such payments made in interstate commerce.

## FACTUAL ALLEGATIONS

### The Role of Anesthesiologists and CRNAs

22.     An anesthesiologist is a physician who specializes in the delivery of anesthesia and related care of patients before, during, and after surgery and other procedures requiring anesthesia. An anesthesiologist must have completed postgraduate medical education with an anesthesiology residency accredited by the Accreditation Council for Graduate Medical Education (ACGME) or the American Osteopathic Association (AOA). A Certified Registered Nurse Anesthetist ("CRNA") is an advanced practice registered nurse with graduate-level education who provides anesthesia services under the supervision of a physician. When anesthesia is administered by a CRNA, it is recognized as the practice of nursing; when administered by a physician anesthesiologist, it is recognized as the practice of medicine.

23.     Anesthesia providers administer anesthesia so patients do not feel pain when they are undergoing procedures. For example, prior to surgery, anesthesia providers place invasive lines

and regional nerve blocks. Anesthesia providers also perform other critical clinical functions, including monitoring and maintaining patients' normal vital signs (e.g., respirations, pulse, blood pressure, body temperature); identifying and treating any related emergencies that may occur before, during, or after the procedures (e.g., allergic reactions to medication, bleeding, changes in vital signs); and controlling pain and providing other care post-procedures.

24.    Anesthesia providers play critical roles in the care of patients in every hospital because anesthesia is required for all, or virtually all, surgeries, more invasive cardiac procedures, and deliveries of newborns involving epidurals and cesarean sections, as well as all endoscopies, among other procedures. Surgeries and invasive cardiac procedures are essential components of the services provided by virtually every hospital to assure full-service care to their patients. Since these procedures are the most profitable, their offering also helps hospitals afford to offer patients other unprofitable but necessary medical procedures.

25.    Anesthesiologists may delegate certain tasks to CRNAs while supervising their work, freeing up anesthesiologists' time to provide oversight and care for several cases simultaneously. Therefore, CRNAs help relieve the demand for anesthesiologists to personally perform every case.

26.    Typically, hospitals obtain the services of anesthesia providers either by employing them directly or contracting with an independent group that employs a significant number of anesthesiologists and CRNAs. Unlike how a patient may select a surgeon to perform a procedure, patients typically do not directly select a particular anesthesiology group or specific anesthesiology provider. Patients typically accept the services of whichever anesthesiology provider is available at the hospital at the time of their procedure.

27.     All anesthesia groups and hospitals depend significantly on the supply of anesthesia providers in the local area in which a hospital is situated. Most anesthesia providers are unwilling to uproot their families and relocate, and many are unwilling to do so even if they receive compensation at levels substantially above market rates. In addition, a stable relationship with a core group of local anesthesia providers who know the surgeons and other professionals working at the hospital significantly enhances the care of patients.

28.     CRNAs, in particular, are paid about half as much as anesthesiologists, must find a supervising physician, and are licensed in the state where they practice, so their incentive to leave a particular locale is even lower.

29.     There is a significant shortage of CRNAs, both nationally and locally in Jefferson County, Texas. According to the Texas Department of State Health Services, only 31 licensed CRNAs resided in all of Jefferson County as of 2024.[3] According to Dr. Ray Callas, President of Anesthesia Associates, trying to find a CRNA in Southeast Texas is "like trying to find a needle in a haystack," and, as of 2024, there were only "eight or nine" CRNAs in Beaumont, Texas.

**Anesthesia Associates and its Agreements to Provide Services in Jefferson County**

30.     Anesthesia Associates is a physician-owned medical group that employs anesthesiologists and CRNAs to provide anesthesia-related services.

---

[3]     Supply and Distribution Tables for State-Licensed Health Professions in Texas, Table for Certified Registered Nurse Anesthetists *available at* https://web.archive.org/web/20250905001530/https://www.dshs.texas.gov/center-health-statistics/health-professions-resource-center-hprc/supply-distribution-tables-state-licensed-health-professions-texas/certified-registered-nurse-anesthetists/certified-registered-nurse-anesthetists-2024

31.     Anesthesia Associates has an agreement to provide anesthesiology services at Baptist Hospital of Southeast Texas ("Baptist"), as well as various surgery centers in Jefferson County. Until recently, Anesthesia Associates also had an agreement to provide anesthesiology services at CHRISTUS's St. Elizabeth Hospital ("St. Elizabeth").

32.     Upon information and belief, for more than a decade prior to August 1, 2025, Anesthesia Associates had a contract for some duration to provide anesthesia services at every location requiring such services in Jefferson County, including the three inpatient general acute care hospitals in Jefferson County—Baptist, St. Elizabeth, and the Medical Center of Southeast Texas ("the Medical Center")—as well as surgery centers within the County.

33.     St. Elizabeth is a 431-bed acute care and trauma center. Notably, it is the only Level III trauma center in Southeast Texas. As a Level III trauma center, St. Elizabeth must be prepared 24 hours per day, 7 days per week to treat severely injured patients who require emergency surgeries. Anesthesia would be required for virtually all service lines and specialties that an emergency patient needing a Level III trauma center would require. Thus, it is critically important that St. Elizabeth has anesthesia providers available to handle scheduled surgeries and unscheduled emergencies.

34.     When they are on call, CRNAs need to be able to reach St. Elizabeth within 30 minutes.

35.     Anesthesia Associates entered into a contract with CHRISTUS in September 2024 to provide anesthesia services at CHRISTUS facilities in Jefferson County, including St. Elizabeth. The contract was for three years, but it allowed either party to terminate without cause on 120 days' written notice.

36.     In early 2025, Anesthesia Associates decided that its contract at St. Elizabeth was not sufficiently lucrative. Two physician groups—Southeast Texas Gastroenterology and Beaumont Bone & Joint—that had been using St. Elizabeth left for other hospitals. With those physician groups leaving, Anesthesia Associates claimed the money it was receiving under its contract with CHRISTUS was not adequate.

37.     Upon information and belief, despite having contracts to provide anesthesia services, Anesthesia Associates refused to meet the demand for anesthesia services at all such facilities. Anesthesia Associates cherry-picked which surgeons or facilities for which it would provide adequate coverage.

38.     Upon information and belief, Southeast Texas Gastroenterology moved all its surgeries to Baptist because Anesthesia Associates would not provide regular, dependable anesthesia services for the group's gastrointestinal surgeries at St. Elizabeth.

39.     Anesthesia Associates decided to terminate its contract with CHRISTUS to force CHRISTUS to increase its compensation. On March 31, 2025, Anesthesia Associates formally notified CHRISTUS that it was terminating the contract effective August 1, 2025. Anesthesia Associates' termination letter said the "terms" of the contract it had entered into just six months earlier "no longer align with the financial realities we face." Anesthesia Associates stated plainly that its goal in terminating the contract was to try to negotiate a new one on more favorable financial terms.

40.     Although Anesthesia Associates stated a desire to renegotiate its agreement with St. Elizabeth, upon information and belief, Anesthesia Associates stonewalled negotiations with St. Elizabeth during the ensuing months until CHRISTUS was forced to sign a contract for

anesthesia services with EmergencHealth on July 3, 2025, to begin providing anesthesia services on August 1, 2025.

**Plaintiffs and their Agreements with Anesthesiology Associates**

41.    Plaintiffs are CRNAs who were working for Anesthesia Associates when Anesthesia Associates tried to renegotiate with CHRISTUS. All Plaintiffs practiced frequently at St. Elizabeth.

42.    Anesthesia Associates' compensation packages were not consistent with the market for CRNA services. For example, the compensation initially offered to Plaintiff Gibbs was approximately $30,000 lower than the compensation Anesthesia Associates previously offered to its CRNAs. More recently, in early 2025, Anesthesia Associates publicized a compensation package for recruitment purposes that it did not implement for its CRNAs. In all cases, Anesthesia Associates did not offer compensation at market rates unless and until it was faced with the prospect of a significant number of CRNAs seeking employment elsewhere; CRNAs, including Plaintiffs, would sometimes go years without receiving pay raises.

43. Plaintiffs had employment agreements with Anesthesia Associates that contained identical restrictive covenants. The noncompetes prohibit Plaintiffs from providing anesthesia services for three years within a 20-mile radius of any facility where they provided services while employed at Anesthesia Associates:

> **1.4. Covenant Not To Compete**
> In consideration of Employer's disclosure to Employee of Confidential and Proprietary Information and the provision of specialized training and knowledge relating to the services to be provided by Employee under this Agreement, Employee hereby covenants and agrees that for a period of ***three (3) years immediately following the termination of this Agreement and Employee's employment with Employer, Employee shall not, directly or indirectly, in any capacity whatsoever, practice nursing as a CRNA, or provide CRNA services, at any physician office, hospital, ambulatory surgical center, or other health care facility that is located within a twenty (20) mile radius of each***

*physician office, hospital, ambulatory surgical center, and other health care facility at which Employee provided CRNA services as an employee of Employer at any time during the Employment Period.*

(emphasis added).

44. All Plaintiffs were required to agree to the noncompetes as a condition of employment. Plaintiff Hoffpauir tried to negotiate the noncompete when he was hired in 2014, but Callas told him it was not negotiable. Plaintiff Mendoza also tried to negotiate the noncompete when he was hired in 2017 but was also told that it was not negotiable.

45. Upon information and belief, Anesthesia Associates has required all but two of its employed CRNAs to sign noncompetes as a condition of employment for more than a decade. The two employed CRNAs who were not required to sign noncompetes were among the first CRNAs hired by Anesthesia Associates.

46. Plaintiffs' employment agreements with Anesthesia Associates also contain identical liquidated damages clauses, where the parties agreed in advance to a $30,000 penalty in the event of a breach of Paragraph 11.4 (Covenants Not to Compete).

47. Plaintiff Hoffpauir discussed his employment agreement, including the noncompete and liquidated damages terms, with Callas and Dr. Steve Schange ("Schange"), an Anesthesia Associates partner, sometime around 2021 in the physician's lounge. At the time, Anesthesia Associates had asked Plaintiff Hoffpauir to sign a new employment agreement for a change in his compensation package. Callas and Schange told him the non-compete was nothing to worry about because it included a $30,000 "buyout" provision, which was "nothing" compared to the anesthesiologists' term of $300,000.

48. Moreover, EmergencHealth arranged a meeting with Callas on July 1 to discuss how to handle CRNA staffing at St. Elizabeth after EmergencHealth took over the hospital's contract.

16

At that meeting, representatives of EmergencHealth asked Callas if there were "buyouts" for any noncompetes in its CRNA contracts, as EmergencHealth was willing to negotiate to pay Anesthesia Associates if any CRNAs approached it for employment after the St. Elizabeth contract was taken over. In response, Callas agreed to allow EmergencHealth to buy out the noncompetes of the CRNAs pursuant to their agreements.

49.    EmergencHealth placed advertisements for CRNAs to work at St. Elizabeth. Ultimately, eight CRNAs from Anesthesia Associates, including Plaintiffs, applied and were hired by EmergencHealth to continue working at St. Elizabeth on behalf of EmergencHealth.

50. Despite Anesthesia Associates explicitly stating that EmergencHealth could hire its former CRNAs under these circumstances subject to a buyout, Anesthesia Associates sued Plaintiffs in two separate state court lawsuits to enjoin them from providing anesthesia services within 20 miles of St. Elizabeth, virtually eliminating their ability to work as CRNAs in Jefferson County.

51. Before and after the lawsuits were filed, EmergencHealth offered to pay Anesthesia Associates $30,000 for each CRNA, but Anesthesia Associates refused to accept the money. Instead, Anesthesia Associates demanded $400,000 per CRNA—more than 13 times the contract amount—to drop its demand for injunctive relief, even though Anesthesia Associates no longer provides any anesthesia services at St. Elizabeth, and even though it admittedly has no economic damages whatsoever resulting from Plaintiffs' employment with EmergencHealth or provision of services to St. Elizabeth. In fact, Dr. Callas sent a text message to Billye Chapman, M.D., that no longer providing anesthesia staffing at St. Elizabeth "is benefitting us tremendously. We are fully staffed, and our income has just increased. Getting out of Saint Elizabeth is like getting rid of a cancer [sic] We were tired of working with locum physicians."



52. Upon information and belief, this ransom demand is inconsistent with Anesthesia Associates' prior practice. Eric Leblanc ("Leblanc"), who began working as a CRNA for Anesthesia Associates around 2014, left Anesthesia Associates around April 2023 to work as a CRNA in Beaumont. Leblanc's new employer paid Anesthesia Associates $30,000 on Leblanc's behalf according to the liquidated damages provision of his employment agreement in recognition of his noncompete. Anesthesia Associates accepted the buyout without issue, and Leblanc immediately began working within the 20-mile radius specified in the noncompete.

53. Anesthesia Associates filed its lawsuit against the first four Plaintiffs—DuBois, Simmons, Bentzen, and Mendoza—on August 1, 2025, the first day EmergencHealth started providing services at St. Elizabeth (the "DuBois Lawsuit").[4] It sued the remaining three Plaintiffs—Martinez, Gibbs, and Hoffpauir—along with EmergencHealth and CHRISTUS in a second lawsuit on August 22, 2025 (the "Martinez Lawsuit").[5]

54. Since then, Anesthesia Associates has obtained a temporary injunction in both cases. A temporary injunction was entered in the DuBois Lawsuit on September 12; a temporary injunction was entered in the Martinez Lawsuit on October 7.

## V. RELEVANT MARKET

55. The relevant product market is the sale of CRNA services at inpatient general acute care hospitals.

56. CRNAs undergo extensive training and specialization. From the perspective of CRNAs who have necessarily invested heavily in their careers, providing other types of services generally is not a reasonably interchangeable substitute for the provision of CRNA services.

57. For example, due to differences in training and expertise, providing other types of healthcare or nursing services generally are not a reasonably interchangeable substitute for the provision of CRNA services.

---

[4] *Anesthesia Associates v. Chad DuBois, Kenneth D. Simmons, III, Monica Bentzen, and Lance T. Mendoza*, No. 25DCCV1411, In the 136th District Court of Jefferson County, Texas, filed Aug. 1, 2025.

[5] *Anesthesia Associates v. Jared Martinez, Garrett Gibbs, John Hoffpauir, Christus Health Southeast Texas, Essential Anesthesia PLLC, EJ Management Company LLC, EmergencHealth PLLLC, and EmergencHealth Services PLLC*, No. 25DCCV1589, In the 60th District Court of Jefferson County, Texas, filed Aug. 22, 2025.

58. Similarly, because hospitals generally require providers who are willing to undertake more intensive cases and be available on-call, providing pain management services or working at outpatient centers such as ambulatory surgery centers generally are not reasonably interchangeable substitutes for the provision of CRNA services at an inpatient general acute care hospital. Many CRNAs working in the non-hospital outpatient setting are unwilling to undertake these additional duties and responsibilities.

59. From the perspective of the buyers of anesthesia services—inpatient general acute care hospitals, health insurers, government payors, patients, etc.—there are no reasonably interchangeable substitutes for the provision of CRNA services. Due to training and certification requirements, only CRNAs and anesthesiologists may administer anesthesia. Moreover, the services provided by anesthesiologists and CRNAs are not the same. Anesthesiologists practice without supervision; CRNAs must practice under the supervision or direction of a physician. Anesthesiologists undergo significantly more training and are prepared to handle more complex situations than CRNAs. Anesthesiologists are paid roughly double what CRNAs are paid. As a result, CRNAs are more limited in where and how they can work than anesthesiologists, who can operate independently.

## VI. RELEVANT GEOGRAPHIC MARKET

60. The relevant geographic markets for the sale of CRNA services to inpatient acute care hospitals are local because patients typically seek inpatient acute care hospital services close to their homes or places of work, and providing CRNA services outside of a local area is not reasonably interchangeable from the perspective of CRNAs. While CRNAs may commute a certain distance to provide services at an inpatient acute care hospital, CRNAs often must be on-call for inpatient general acute care hospitals, meaning they must be within 30 minutes of the

hospital and typically are unable or unwilling to provide services more than 30 minutes from a facility at which they work.

61. One local relevant geographic market for the sale of CRNA services is Jefferson County. Upon information and belief, there are no positions for anesthesia providers in neighboring Hardin County or Orange County.

62. CRNAs who reside outside of Jefferson County are highly unlikely to practice full-time at hospitals in Jefferson County permanently because transportation conditions make daily travel for employment too costly and inconvenient. This is particularly true because CRNAs often need to be "on-call" for emergency surgical and obstetrical procedures. During these on-call shifts, CRNAs must be able to arrive at the hospital within 30 minutes. Upon information and belief, the overwhelming majority of Anesthesia Associates' current full-time CRNA workforce at Baptist Hospital, where it continues to provide services today, resides in Jefferson County.

63. Moreover, Jefferson County CRNAs are in large part from Jefferson County—they are born in Jefferson County, they grow up there, and they return there to raise and support their families. These CRNAs, including Plaintiffs, want to reside in Jefferson County, and the patient population is best served by CRNAs who are residents of the local community.

64. From the perspective of CRNAs, providing CRNA services in other portions of Texas or the United States is not reasonably interchangeable with providing such services in Jefferson County for permanent employment because commuting times would be too long and/or require CRNAs to either live apart from their families or uproot their families from their local jobs, schools, and communities.

65. For that reason, CRNAs from a different county generally would not replace CRNAs in Jefferson County on a permanent basis. While CRNAs outside of Jefferson County may choose

to sell their services in Jefferson County, they will only do so as *locum tenens* CRNAs, meaning they are paid a substantial premium for their willingness to travel long distances. Such CRNAs also generally are not willing to work permanently, full-time in a single location where they do not live—the very nature of *locum tenens* work is that it is temporary. By contrast, non-*locum* CRNAs like Plaintiffs tend to live in the counties where they work, due to the desire to develop a connection with the physician and patient community, the critical care they provide, and requirements to be on-call.

66. The local nature of the relevant geographic market is confirmed by the disparity in CRNA compensation between Jefferson County and other geographic regions within Texas. CRNAs located in Jefferson County would not leave Jefferson County to provide CRNA services elsewhere in response to a small, but significant, non-transitory increase in compensation outside of Jefferson County. Likewise, CRNAs located outside of Jefferson County would not provide CRNA services within Jefferson County in response to a small, but significant, non-transitory increase in compensation within the County.

**VII. ANESTHESIA ASSOCIATES' MARKET POWER IN THE RELEVANT MARKET**

67. The temporary injunctions in both the DuBois and Martinez Lawsuits prohibit the Plaintiffs from working as CRNAs within 20 miles of St. Elizabeth. Anesthesia Associates has admitted that the temporary injunctions effectively prohibit Plaintiffs from working in their profession in all of Jefferson County.

68. Even though there are only approximately 31 CRNAs in Jefferson County, by court order, all seven Plaintiffs are temporarily enjoined from working in Jefferson County for anyone other than Anesthesia Associates.

69. Of course, none of the approximately 13 other CRNAs who either still work for Anesthesia Associates or who left within the last three years are permitted to work as CRNAs in Jefferson County for anyone but Anesthesia Associates, either, because all of these CRNAs are subject to identical noncompete agreements.

70. Anesthesia Associates controls at least two-thirds of the entire CRNA workforce in Jefferson County, as approximately 20 Jefferson County-based CRNAs are currently under threat of a lawsuit and temporary injunction if they work for anyone in Jefferson County but Anesthesia Associates. Anesthesia Associates' substantial market share, coupled with high entry barriers and its ability to both suppress CRNA compensation and demand excessive reimbursement from hospitals, demonstrates Anesthesia Associates' market power with respect to the provision of CRNA services at inpatient general acute care hospitals in Jefferson County.

71.     If Anesthesia Associates' covenants not to compete were enforced for every such CRNA, it would have the immediate effect of limiting direct competition to Anesthesia Associates and foreclosing competitor groups and hospitals from hiring anesthesiology providers subject to these noncompetes. Moreover, these noncompetes give Anesthesia Associates additional power to direct where surgeries and obstetrical procedures are performed in Jefferson County because hospital providers not contracting with Anesthesia Associates cannot adequately staff anesthesia providers as a result of the noncompetes.

### VIII. ANESTHESIA ASSOCIATES' ANTICOMPETITIVE CONDUCT

72. Anesthesia Associates has engaged in anticompetitive conduct by, at one time, contracting with all of the inpatient general acute care hospitals in Jefferson County and entering into noncompete agreements with at least two-thirds of the CRNAs in Jefferson County, thereby blocking competition for the sale of CRNA services at inpatient general acute care hospitals.

73. Anesthesia Associates' CRNA noncompetes not only hamstring the market for the sale of CRNA services in Jefferson County, but Anesthesia Associates' refusal to accept the $30,000 "buyout" bargained for in its employment agreements, as well as its pursuit of two temporary injunctions in state court against Plaintiffs pursuant to those noncompetes, are anticompetitive and have market-wide anticompetitive effects on Jefferson County.

74. Anesthesia Associates' CRNA noncompetes also depress wages for its CRNA employees because the employees cannot provide anesthesia services in Jefferson County outside of Anesthesia Associates for three years. Accordingly, the CRNAs have no leverage to negotiate market-based raises or compensation because the CRNAs have no realistic alternative but to contract with Anesthesia Associates.

75. When asked at the hearing on the temporary injunction in the Martinez Lawsuit why it needed injunctive relief, Anesthesia Associates did not even attempt to disguise its unlawful intent to monopolize the market for CRNAs in Jefferson County. Under oath, Anesthesia Associates brazenly admitted that it sued the CRNAs not to protect a legitimate business interest like trade secrets or customer relationships, but rather to control the market for CRNAs so that EmergencHealth would have to hire replacement CRNAs from outside the relevant market at a much higher cost:

> Q.    . . . Through next summer for certain, Anesthesia Associates will not be able to do any business at Christus St. Elizabeth, fair?
> A.    Fair.
> Q.    Okay. So, in light of that -- I just want to clarify -- whether these individuals go to Christus or move is not going to affect Anesthesia Associates in any way at all, fair?
> A. Repeat the question one more time.
> Q. Yes, sir. These three individuals, whether they have to go to Baytown or Christus, will not affect Anesthesia Associates in any way, fair?
> A.    I would have to disagree because if -- *if EmergencHealth didn't poach our CRNAs, Christus then would be scrambling to try to find*

24

> *anesthesia services. It's very easy whenever you grab people that are local and you take them from someone that has been the home for them for a long time.*
>
>                                                  . . .
>
> Q.      You understand that if these three individuals go to Christus or go to Baytown, that is not going to make any difference for the next year to Anesthesia Associates, fair?
>
> A. No. It makes a difference *because you're making it easy for Christus to have anesthesia workforce that is coming from me*.
>
> Q. Okay. So, what your goal is to punish Christus for these individuals going to work over there?
>
> A.      I'm not punishing Christus*. There was a noncompete in place that they should have to adhere to.*

Testimony of Gerald Raymond Callas, TI Hearing Excerpt, 45:13-21; 46:6-16 (emphasis added).

76. In other words, Anesthesia Associates was not concerned about potential or actual harm to Anesthesia Associates as a result of alleged violations of the noncompetes. Instead, Anesthesia Associates is concerned only with harming a hospital, CHRISTUS, and, by extension, Anesthesia Associates' competitor, EmergencHealth, by making it harder to find a replacement "anesthesia workforce." That is so because, by Anesthesia Associates' own admission, there would be no other "local" CRNAs available for EmergencHealth to hire if the restrictive covenants in its employment agreements were enforced.

77. The potential anticompetitive effects of noncompete agreements are well known. In addition to bringing various enforcement actions challenging noncompete agreements, the Federal Trade Commission considered a nationwide rulemaking that would ban noncompete agreements and recently announced its intent to further study and investigate noncompete agreements as a violation of the antitrust laws. *See* Request for Information Regarding Employer Noncompete Agreements, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/2025-Noncompete-RFI.pdf.

78. The Commission has explained that noncompetes "may unjustifiably prevent workers from moving to better jobs, impede new business formation, prevent the shift of labor from over-served to under-served markets, and harm rival employers' ability to compete. This leads to lower worker earnings, lost innovation, higher consumer prices, and overall negative effects on workers' and consumers' quality of life. These concerns may be especially significant in healthcare markets, where noncompete agreements may limit employment options for nurses, physicians, and other medical professionals and thereby restrict patients' choices of who provides their medical care." *Id*.

### IX. ANTITRUST INJURY AND HARM TO COMPETITION

79. Anesthesia Associates' noncompete agreements with its CRNAs do not serve any reasonable business interest. Anesthesia Associates does not possess any unique customer information or goodwill or have any proprietary methodologies for providing anesthesia services. Anesthesia Associates does not advertise its services to prospective patients, nor does it maintain any confidential patient lists or have its own hospital patients. The healthcare facilities, including St. Elizabeth, provide the patients for which Anesthesia Associates' CRNAs care.

80. Anesthesia Associates does not provide its CRNAs with significant specialized training; rather, its CRNAs all receive specialized training before becoming employed.

81. Finally, even if Anesthesia Associates had an interest in preventing competition for anesthesia services at St. Elizabeth during the term of its contract with CHRISTUS, that interest no longer exists. By its own admission, Anesthesia Associates no longer competes with anyone for the provision of anesthesia services at St. Elizabeth, having chosen unilaterally to cancel the contract.

82. As a result of the lawsuits filed by Anesthesia Associates in state court and subsequent temporary injunctions preventing Plaintiffs from providing anesthesia services in Jefferson County, inpatient general acute care hospitals like St. Elizabeth face a threatened shortage of CRNAs. While *locum tenens* providers may serve as a stopgap, they are not a viable alternative for the provision of anesthesia services long term due to their expense and lack of ability to develop relationships and expertise at the hospitals. Ultimately, if Anesthesia Associates is successful, a shortage of CRNAs could jeopardize St. Elizabeth's ability to provide adequate staffing for its Emergency Department and its ability to serve as the region's only Level III trauma center. This risk could severely jeopardize the health and well-being of patients in Jefferson, Hardin, and Orange Counties.

83. Anesthesia Associates' tactics are designed to cause EmergencHealth to be unable to deliver on its contract with CHRISTUS profitably because it cannot staff CRNAs, thus forcing CHRISTUS to terminate the contract and return to contracting with Anesthesia Associates. Anesthesia Associates would then use its monopoly on CRNAs in Jefferson County to exclude rival physician groups and extract monopoly prices from CHRISTUS.

84. Plaintiffs are also harmed by Anesthesia Associates' lock-up of the CRNA labor market. Plaintiffs are effectively barred by the noncompetes and temporary injunctions from working as CRNAs in the county where they live. While they could theoretically return to Anesthesia Associates, that would not solve the problem because Anesthesia Associates no longer has a contract to provide services at St. Elizabeth. Their only alternative option would be to leave Jefferson County entirely to seek employment as an anesthesia provider elsewhere as a result of Anesthesia Associates' anticompetitive conduct. Doing so would cause significant harm to the CRNAs because the nearest facilities requiring anesthesia providers are at least an hour away from

Plaintiffs without traffic. Because of on-call requirements mandating that they be within 30 minutes of the hospital during those shifts, working outside of Beaumont means either leaving their families for days at a time so that they can work multiple shifts back-to-back or uprooting their families entirely so they can live close to the hospital. This is the same Hobson's choice for any CRNA currently employed by Anesthesia Associates.

85. CRNAs subject to Anesthesia Associates' noncompetes, including Plaintiffs, are also subject to depressed compensation because they must either continue to work at Anesthesia Associates or stop providing anesthesia services in Jefferson County. They have no ability to compete for market-based compensation without uprooting or leaving their families.

86. No Plaintiff has an active nursing license in any state other than Texas. The dynamics of the market make it difficult for the CRNAs to provide their services in a reasonably accessible area without uprooting their families and moving to an entirely different county or state.

87. Every day that passes intensifies the burden on Plaintiffs because it is another day that they lack a stable CRNA practice and are forced to decide between leaving the county or rejoining Anesthesia Associates. Plaintiffs have suffered financial harm in the form of reduced compensation and opportunities as a result of Anesthesia Associates' noncompetes.

88. The Beaumont community would also be impacted by the loss of seven dedicated CRNAs—approximately 23% of all CRNAs in Jefferson County. The community relies on the already tight CRNA workforce to provide anesthesiology services at three local hospitals. The loss of almost a quarter of Jefferson County's CRNAs would irreparably harm residents of Jefferson County.

## X. VIOLATIONS ALLEGED

### COUNT I
### UNLAWFUL COMBINATION AND AGREEMENTS UNDER
### SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

89. Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint.

90. Anesthesia Associates has used noncompete agreements to obtain substantial market power with respect to the sale of CRNA services in Jefferson County, locking up at least two-thirds of the market for CRNA services, or 20 of 31 CRNAs in Jefferson County.[6]

91. Each of the employment agreements between Anesthesia Associates and its CRNAs, including Plaintiffs, is a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

92. The existence of the noncompetes and the subsequent temporary injunctions cement Anesthesia Associates' market power in Jefferson County and unreasonably restrain trade by giving it the ability to raise prices charged for CRNA services, depress CRNA compensation, and exclude competition for CRNAs in Jefferson County. The noncompetes exacerbate an already pronounced CRNA shortage and increase barriers to entry given the localized nature of CRNA services.

93. Furthermore, there is no legitimate business justification for the noncompetes, and any benefits of the noncompetes are far outweighed by the anticompetitive effects in the market for the sale of CRNA services in Jefferson County.

---

[6] County CRNA statistics simply identify the number of licensed nurse anesthetists. This figure understates Anesthesia Associates' market power for CRNAs who practice in general acute care settings, which is distinct from CRNAs who practice in other settings.

94. CRNAs, including Plaintiffs, have received lower compensation than they otherwise would have received in the absence of the noncompetes, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

**COUNT II**
**UNLAWFUL COMBINATION AND AGREEMENTS UNDER**
**SECTION 15.05(a) OF THE TEXAS FREE ENTERPRISE AND ANTITRUST ACT,**
**TEX. BUS. & COM. CODE § 15.05(a)**

95.     Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint.

96. Anesthesia Associates has used noncompete agreements to obtain substantial market power with respect to the sale of CRNA services in Jefferson County, locking up at least two-thirds of the market for CRNA services, or 20 of 31 CRNAs in Jefferson County.

97. Each of the employment agreements between Anesthesia Associates and its CRNAs, including Plaintiffs, is a contract, combination, and conspiracy within the meaning of the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.05(a).

98. The existence of the noncompetes and the subsequent temporary injunctions cement Anesthesia Associates' market power in Jefferson County and unreasonably restrain trade by giving it the ability to raise prices charged for CRNA services, depress CRNA compensation, and exclude competition for CRNAs in Jefferson County. The noncompetes exacerbate an already pronounced CRNA shortage and increase barriers to entry given the localized nature of CRNA services.

99. Furthermore, there is no legitimate business justification for the noncompetes, and any benefits of the noncompetes are far outweighed by anticompetitive effects in the market for the sale of CRNA services in Jefferson County.

100.    CRNAs, including Plaintiffs, have received lower compensation than they otherwise would have received in the absence of the noncompetes and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

## COUNT III
## MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2

101.    Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint.

102.    Anesthesia Associates possesses monopoly power with respect to the sale of CRNA services in Jefferson County, controlling at least two-thirds of the CRNA labor supply through its noncompete agreements.

103.    Anesthesia Associates has used noncompete agreements—rather than superior business acumen—to obtain monopoly power in the relevant market. Anesthesia Associates' monopoly power is reflected in its ability to raise the price of CRNA services, depress CRNA compensation, and exclude competition for CRNAs in Jefferson County, irrespective of Anesthesia Associates' market share. The noncompetes exacerbate an already pronounced CRNA shortage and increase barriers to entry given the localized nature of CRNA services.

104.    Moreover, the two state lawsuits filed by Anesthesia Associates have been and are being pursued in order to maintain and enhance Anesthesia Associates' monopoly power over the CRNA labor supply.

105.    Furthermore, there is no legitimate business justification for the noncompetes, and any benefits of the noncompetes are far outweighed by anticompetitive effects in the market for the sale of CRNA services in Jefferson County.

106.    CRNAs, including Plaintiffs, have received lower compensation than they otherwise would have received in the absence of the noncompetes, and as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

**COUNT IV**
**MONOPOLIZATION UNDER SECTION 15.05(b) OF THE TEXAS**
**FREE ENTERPRISE AND ANTITRUST ACT, TEX. BUS. & COM. CODE § 15.05(b)**

107.    Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint.

108.    Anesthesia Associates possesses monopoly power with respect to the sale of CRNA services in Jefferson County, controlling at least two-thirds of the CRNA labor supply through its noncompete agreements.

109.    Anesthesia Associates has used noncompete agreements—rather than superior business acumen—to obtain monopoly power in the relevant market. Anesthesia Associates' monopoly power is reflected in its ability to raise the price of CRNA services, depress CRNA compensation, and exclude competition for CRNAs in Jefferson County, irrespective of Anesthesia Associates' market share. The noncompetes exacerbate an already pronounced CRNA shortage and increase barriers to entry given the localized nature of CRNA services.

110.    Moreover, the two state lawsuits filed by Anesthesia Associates have been and are being pursued in order to maintain and enhance Anesthesia Associates' monopoly power over the CRNA labor supply.

111.    Furthermore, there is no legitimate business justification for the noncompetes, and any benefits of the noncompetes are far outweighed by anticompetitive effects in the market for the sale of CRNA services in Jefferson County.

112.    CRNAs, including Plaintiffs, have received lower compensation than they otherwise would have received in the absence of the noncompetes, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

**COUNT V**
**ATTEMPTED MONOPOLIZATION UNDER**
**SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**

113.    Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this complaint.

114.    There is a dangerous probability that Anesthesia Associates will acquire monopoly power with respect to the sale of CRNA services in Jefferson County, where it already controls at least two-thirds of the CRNA labor supply through its noncompete agreements.

115.    Now that Anesthesia Associates has two temporary injunctions in place to keep seven of its former CRNA employees from practicing in Jefferson County, Anesthesia Associates' ability to depress CRNA wages, raise prices for anesthesia services, and further exclude competition in the CRNA labor market, coupled with the barriers to entry described above, demonstrate a dangerous probability that Anesthesia Associates will succeed in monopolizing the market for the sale of CRNA services in Jefferson County irrespective of its market shares.

116.    Monopolization of the market for the sale of CRNA services in Jefferson County will also allow Anesthesia Associates to raise prices for CRNA services and suppress CRNA compensation.

117.    Anesthesia Associates entered into the noncompetes with the specific intent to monopolize the relevant market for the sale of CRNA services in Jefferson County.

118.    CRNAs, including Plaintiffs, have received lower compensation than they otherwise would have received in the absence of the noncompetes and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

**COUNT VI**
**ATTEMPTED MONOPOLIZATION UNDER SECTION 15.05(b) OF THE TEXAS**
**FREE ENTERPRISE AND ANTITRUST ACT, TEX. BUS. & COM. CODE § 15.05(b)**

119.    Plaintiffs repeat and reallege the allegations contained in the preceding and succeeding paragraphs of this Complaint.

120.    There is a dangerous probability that Anesthesia Associates will acquire monopoly power with respect to the sale of CRNA services in Jefferson County, where it already controls at least two-thirds of the CRNA labor supply through its noncompete agreements.

121.    Now that Anesthesia Associates has two temporary injunctions in place to keep seven of its former CRNA employees from practicing in Jefferson County, Anesthesia Associates' ability to depress CRNA wages, raise prices for anesthesia services, and further exclude competition in the CRNA labor market, coupled with the barriers to entry described above, demonstrates a dangerous probability that Anesthesia Associates will succeed in monopolizing the market for the sale of CRNA services in Jefferson County irrespective of its market shares.

122.    Monopolization of the market for the sale of CRNA services in Jefferson County will also allow Anesthesia Associates to raise prices for CRNA services and suppress CRNA compensation.

123.    Anesthesia Associates entered into the noncompetes with the specific intent to monopolize the relevant market for the sale of CRNA services in Jefferson County.

124.    CRNAs, including Plaintiffs, have received lower compensation than they otherwise would have received in the absence of the noncompetes, and as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

## REQUEST FOR DECLARATORY JUDGMENT

125.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs above, as if fully restated herein.

126.    Plaintiffs request a judgment declaring that the noncompete restrictions in Anesthesia Associates' employment agreements with all its current and former nurse anesthetist employees cannot be enforced to prohibit them from working in Jefferson County because Anesthesia Associates possesses market power, and its noncompete restrictions harm competition in the market for the sale of CRNA services in Jefferson County.

127.    In the alternative, to the extent this Court finds the noncompetes enforceable, Plaintiffs request a judgment ordering Anesthesia Associates to permit Plaintiffs to buy out their noncompetes for the agreed $30,000 each.

## CONDITIONS PRECEDENT

128.    All conditions precedent have been performed or have occurred.

## JURY DEMAND

129.    Plaintiffs hereby demand a trial by jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request the Court award them:

a.      Judgment declaring that the noncompetes in the Plaintiffs' employment agreements cannot be enforced to prohibit them from working at any health care facility in Jefferson County, including St. Elizabeth;

b.      Judgment declaring that the covenants not to compete for all CRNA employees of Anesthesia Associates are unlawful under federal and state antitrust laws;

d.      In the alternative, to the extent this Court finds the noncompetes enforceable, Judgment ordering Anesthesia Associates to permit Plaintiffs to buy out their noncompetes for the agreed to $30,000 each;

c.      Three times the damages suffered by Plaintiffs as a result of Anesthesia Associates' exploitation of its monopoly power resulting from the use of the covenants not to compete. This includes the attorneys' fees incurred in this litigation and defending claims by Anesthesia Associates in the DuBois and Martinez Lawsuits;

d.      Injunctive relief preventing Anesthesia Associates from enforcing its covenants not to compete against any former CRNA employee;

e.      All taxable court costs and reasonable attorneys' fees; and

f.      Such other relief, at law or in equity, as this Court finds just.

> Respectfully submitted,
>
> /s/ Jennifer Fleury
> Jennifer Fleury
> Justin W. Bernick
> *(Pro Hac Vice forthcoming)*
> Cori E. Ast
> *(Pro Hac Vice forthcoming)*
> Justin G. Hutchings
> *(Pro Hac Vice forthcoming)*
> HOGAN LOVELLS US LLP
> 555 13th Street, NW
> Washington, DC 20004
> (202) 537-5600
> jennifer.fleury@hoganlovells.com
> justin.bernick@hoganlovells.com
> cori.ast@hoganlovells.com
> justin.hutchings@hoganlovells.com

Chris Portner
PORTNER BOND, PLLC
1905 Calder Avenue
Beaumont, TX 77701
(409) 838-4444
cportner@portnerbond.com

*Counsel for Plaintiffs*