**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

MONICA BENTZEN, CHAD R. DUBOIS, §
GARRETT GIBBS, JOHN HOFFPAUIR, §
JARED MARTINEZ, LANCE T. §
MENDOZA, and KENNETH D. SIMMONS, §
III, §
§
§
Plaintiffs, §
§
versus §    CIVIL ACTION NO. 1:25-CV-568
§
§
ANESTHESIA ASSOCIATES, PA, and §
ANESTHESIA ASSOCIATES GROUP, §
PLLC, §
§
Defendants. §

## MEMORANDUM AND ORDER

Pending before the court is Plaintiffs Monica Bentzen, Chad R. DuBois, Garrett Gibbs, John Hoffpauir, Jared Martinez, Lance T. Mendoza, and Kenneth D. Simmons, III's (collectively "Plaintiffs'") Motion for a Preliminary Injunction (#8). Defendants Anesthesia Associates, PA, and Anesthesia Associates Group, PLLC (collectively, "AA") filed a response (#14). Plaintiffs filed a reply (#18). A preliminary injunction hearing was held on Friday, March 3, 2026. Having considered the motion, the exhibits, the arguments presented by counsel during the hearing, and the relevant law, the court is of the opinion that a preliminary injunction should not be issued.

I.    Background

This case arises from AA's efforts to enforce noncompete provisions in its employment agreements with Plaintiffs. AA is a physician-owned medical group that employs anesthesiologists and Certified Registered Nurse Anesthetists ("CRNAs") to provide anesthesia-related services. AA has an agreement to provide anesthesiology services at Baptist Hospital of Southeast Texas

("Baptist"), as well as various surgery centers in Jefferson County.  Until recently, AA also had an agreement to provide anesthesiology services at CHRISTUS's St. Elizabeth Hospital ("St. Elizabeth") in Beaumont, Texas.  AA entered into a contract with CHRISTUS in September 2024 to provide anesthesia services at CHRISTUS facilities in Jefferson County, including St. Elizabeth. The contract was for three years, but it allowed either party to terminate without cause on 120 days' written notice.  In early 2025, AA decided that its contract with St. Elizabeth was not sufficiently profitable.  Two physician groups—Southeast Texas Gastroenterology and Beaumont Bone & Joint—ceased their affiliation with St. Elizabeth to open their own surgical centers.  With those physician groups departing, AA claimed the compensation it was receiving under its contract with CHRISTUS was inadequate.   According to Plaintiffs, AA decided to terminate its contract with CHRISTUS to force CHRISTUS to increase the compensation rate.  On March 31, 2025, AA formally notified CHRISTUS that it was terminating the contract effective August 1, 2025.  AA's termination letter said the "terms" of the contract it had entered into just six months earlier "no longer align with the financial realities we face."  AA stated plainly that its goal in terminating the contract was to try to negotiate a new one on more favorable financial terms.   The negotiations, however, resulted in an impasse.  On July 3, 2025, CHRISTUS signed a contract for anesthesia services with EmergencHealth ("EH") to begin providing services on August 1, 2025.

Plaintiffs are CRNAs who were employed by AA for several years[1] and were working for AA during its negotiations with CHRISTUS.  All Plaintiffs practiced frequently at St. Elizabeth's. Plaintiffs had employment agreements with AA that contained identical restrictive covenants.  The noncompete clauses prohibit Plaintiffs from providing anesthesia services for three years within a 20-mile radius of any facility where they provided services while employed at AA:

> 11.4. Covenant Not To Compete
>
> In consideration of Employer's disclosure to Employee of Confidential and Proprietary Information and the provision of specialized training and knowledge relating to the services to be provided by Employee under this Agreement, Employee hereby covenants and agrees that for a period of three (3) years immediately following the termination of this Agreement and Employee's employment with Employer, Employee shall not, directly or indirectly, in any capacity whatsoever, practice nursing as a CRNA, or provide CRNA services, at any physician office, hospital, ambulatory surgical center, or other health care facility that is located within a twenty (20) mile radius of each physician office, hospital, ambulatory surgical center, and other health care facility at which Employee provided CRNA services as an employee of Employer at any time during the Employment Period.

All Plaintiffs were required to agree to the noncompete clause as a condition of employment.[2] Although Plaintiffs Hoffpauir and Mendoza allegedly attempted to negotiate the noncompetes at the time they were hired, they were told the noncomepete terms were not negotiable.

---

[1] Specifically, Monica Bentzen ("Bentzen") began employment for AA in April 2022; Chad R. DuBois ("DuBois") in June 2013; Garrett Gibbs ("Gibbs") in July 2014; John Hoffpauir ("Hoffpauir") in February 2015; Jared Martinez ("Martinez") in June 2014; Lance T. Mendoza ("Mendoza") in January 2017; and Kenneth D. Simmons III ("Simmons") in June 2020.

[2] Plaintiffs claim that AA has required all but two of its employed CRNAs to sign noncompetes as a condition of employment for more than a decade.  The two employed CRNAs who were not required to sign noncompetes were among the first CRNAs hired by AA.

Plaintiffs' employment agreements with AA also contain identical liquidated damages clauses, where the parties agreed in advance to a $30,000 penalty in the event of a breach of Paragraph 11.4.  The remedies clause states as follows:

11.9. Remedies in the Event of Breach

(a)  Employee acknowledges and agrees that any material breach or violation of Employee's promises, agreements, or covenants contained in Paragraph 11 will have an irreparable, material, and adverse effect upon Employer, and that damages arising from any such breach or violation may be difficult to ascertain.  Without limiting any other remedy at law or in equity available to Employer, in the event of any such breach, Employer shall have the right to an immediate temporary restraining order and temporary injunction enjoining Employee's breach or violation, without the need to post any security or bond, as well as all other remedies available at law and in equity;

(b)  Employer and Employee wish to fix in advance, as liquidated damages, the amount of compensation for which Employee shall be liable to Employer in the event of any material breach or violation of Employee's promises, agreements, or covenants contained in Paragraph 11.3 (Non-Disclosure) or Paragraph 11.4 (Covenant Not to Compete).  Employer and Employee agree that Employer would suffer harm from any such material breach or violation, but that the amount of such damages is difficult or incapable of estimation.  Accordingly, Employer and Employee agree on the following liquidated damages, which are their reasonable forecasts of just compensation:

. . .

(ii)  In the event of a material breach or violation of Employee's promises, agreements, or covenants contained in Paragraph 11.4, Employee shall pay to Employer $30,000.00 immediately upon the occurrence of such breach or violation.

On July 1, 2025, representatives of EH held a meeting with Dr. Ray Callas ("Callas"), the President of AA, to discuss how to handle CRNA staffing at St. Elizabeth after EH took over the hospital's contract.  Plaintiffs claim that at the meeting,  Callas was asked if there were "buyouts" for any noncompete agreements in its CRNA contracts, as EH was willing to negotiate to pay AA if any CRNAs approached it for employment after it took over the St. Elizabeth contract.  In

4

response, Callas allegedly agreed to allow EH to buy out the noncompete clauses of the CRNAs pursuant to the liquidated damages provision of their agreements.  EH subsequently placed advertisements for CRNAs to work at St. Elizabeth.  Ultimately, eight CRNAs from AA, including Plaintiffs, applied and were hired by EH to continue working at St. Elizabeth on behalf of EH.

Despite the purported understanding between EH and AA regarding EH's hiring of former AA CRNAs, AA sued Plaintiffs in two separate state court actions to enjoin them from providing anesthesia services within 20 miles of St. Elizabeth, virtually eliminating their ability to work as CRNAs in Jefferson County, Texas.  Before and after the lawsuits were filed, EH offered to pay AA $30,000 for each CRNA, but AA refused to accept the money.  Instead, AA demanded $400,000 per CRNA to drop its demand for injunctive relief.  According to Plaintiffs, AA suffered no economic damages resulting from their employment with EH or provision of services to St. Elizabeth, as evidenced by a text message sent by Callas to Dr. Billye Chapman, wherein he stated that terminating the contract with St. Elizabeth "is benefitting us tremendously.  We are fully staffed, and our income has just increased.  Getting out of [St.] Elizabeth is like getting rid of a cancer[.] We were tired of working with locum physicians[.]"

AA filed its lawsuit in Jefferson County against the first four Plaintiffs—DuBois, Simmons, Bentzen, and Mendoza—on August 1, 2025, the first day EH started providing services at St. Elizabeth (the "DuBois Lawsuit").  AA sued the remaining three Plaintiffs in Jefferson County—Martinez, Gibbs, and Hoffpauir—along with EH and CHRISTUS in a second lawsuit on August 22, 2025 (the "Martinez Lawsuit").  Temporary injunctions were obtained by AA in both cases, entered on September 12, 2025, in the DuBois lawsuit and October 7, 2025, in the Martinez

lawsuit.  Specifically, having found the noncompete covenants valid and enforceable, the state courts ruled that Plaintiffs are prohibited from violating their noncompete covenants with AA. Accordingly, Plaintiffs were enjoined from practicing nursing as CRNAs or providing CRNA services at St. Elizabeth or at any physician office, hospital, ambulatory surgical center, or other health care facility that is located within a twenty (20) mile radius of that location.

On December 3, 2025, Plaintiffs filed the present action against AA requesting damages and injunctive relief.  Particularly, in their Complaint (#1), Plaintiffs assert causes of action against AA for unlawful combination and agreements under § 1 of the Sherman Act and § 15.05(a) of the Texas Free Enterprise and Antitrust Act ("TFEAA") and monopolization and attempted monopolization under § 2 of the Sherman Act and § 15.05(b) of the TFEAA.  On December 19, 2025, Plaintiffs filed a Motion for Preliminary Injunction (#8).  Defendants filed a response (#14), and Plaintiffs filed a reply (#18).  A preliminary injunction hearing was held on Friday, March 3, 2026.

## II.    Analysis

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *4 (5th Cir. Feb. 17, 2022); *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 (5th Cir. 2014).  "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on

6

the merits." *Camenisch*, 451 U.S. at 395; *Lackey*, 604 U.S. at 200; *Jonibach Mgmt. Tr.*, 750 F.3d at 491.  Therefore, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Camenisch*, 451 U.S. at 395; *Jonibach Mgmt. Tr.*, 750 F.3d at 491.

To obtain a preliminary injunction, the movant must generally establish:  (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) the injunction will not undermine the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 198 (5th Cir. 2024); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012).  The United States Court of Appeals for the Fifth Circuit has frequently cautioned that a preliminary injunction is an "extraordinary remedy" and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.  *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013); *see TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025); *Siders v. City of Brandon*, 123 F.4th 293, 300 (5th Cir. 2024); *Hydraflow Indus. NZ Ltd. v. Individuals*, No. 1:22-CV-962-LY, 2022 WL 16625792, at *1 (W.D. Tex. Nov. 1, 2022).  Thus, the burden placed on a movant to establish that injunctive relief is appropriate is heavy.  *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985); *Louisiana v. U.S. Env't Prot. Agency*, 712 F. Supp. 3d 820, 864 (W.D. La. 2024).

A.    Likelihood of Success on the Merits

"To satisfy the first element of likelihood of success on the merits, the [movant's] evidence in the preliminary injunction proceeding 'is not required to prove [its] entitlement to summary judgment.'" *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017) (quoting *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009)).  Rather, success on the merits must be "considerably more likely" than not. *Tex. Voters All. v. Dallas County*, 495 F. Supp. 3d 441, 457-58 (E.D. Tex. 2020) (quoting *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003)).  The Fifth Circuit applies a "sliding scale" analysis to the four preliminary injunction factors.  *TitleMax*, 142 F.4th at 328; *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). "Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." *TitleMax*, 142 F.4th at 328 (quoting *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)).  Courts look to the standards provided by the applicable substantive law when assessing the likelihood of success on the merits. *TitleMax*, 142 F.4th at 329 (citing *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011)).

1.    Prima Facie Case

In their complaint, Plaintiffs assert claims against AA for unlawful combination and agreements under § 1 of the Sherman Act and § 15.05(a) of the TFEAA and monopolization and attempted monopolization under § 2 of the Sherman Act and § 15.05(b) of the TFEAA.  The court addresses each claim in turn.

a.        Unlawful Combination and Agreements

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  "To establish a Section 1 violation, 'a plaintiff must show that the defendant[ ] (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market.'"  *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (quoting *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015)).  In this context, a conspiracy simply means an "agreement."  *BRFHH*, 49 F.4th at 525.  To succeed on a Section 1 claim, plaintiffs must make a showing of concerted action.  *Drs. Hosp. of Laredo v. Cigarroa*, 782 F. Supp. 3d 406, 440 (W.D. Tex. 2025) (citing *Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007)).  Independent decisions are not actionable under Section 1.  *Id.* at 526.  Rather, Section 1 prohibits unreasonable restraints on trade effected by a contract, combination, or conspiracy between separate entities.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 328 (5th Cir. 2015).

Although infrequently litigated in federal courts, Section 1 applies to post-employment noncompetition agreements.  *See Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1564 (11th Cir.1983); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977) ("[E]mployee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act."); *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 843-844 (5th Cir.1975).  Such agreements imposing vertical restraints on competition are not per se violations of the Sherman Act but must be analyzed under the rule of reason.  *Aya Healthcare Servs., Inc. v. AMN*

*Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (noting that nearly every vertical restraint is assessed under the rule of reason); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984) (applying rule of reason in determining validity of noncompetition agreement); *Davis v. Hanna Holdings, Inc.*, 787 F. Supp. 3d 42, 62 (E.D. Pa. 2025); *see DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990) ("[W]e hold that a post-employment noncompetition agreement does not violate section 15.05(a) unless it fails the same rule of reason analysis that would be applied under federal law."). Under the rule of reason, a plaintiff must prove that the agreement has an adverse effect on competition in the relevant market. *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 820 (9th Cir. 2023); *Consultants*, 720 F.2d at 1562; *Davis*, 787 F. Supp. 3d at 62. "[E]valuating the merits of a restraint of trade under the rule of reason requires consideration of a variety of 'facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; [and] the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.'" *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 748 (5th Cir. 2015) (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 n. 10 (2010)). The Supreme Court of the United States has set forth a three-step burden-shifting framework that applies to the rule-of-reason inquiry:

> [T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018) (citations omitted); *accord Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492 (5th Cir. 2021).

"[T]o sustain claims under either § 1 or § 2, a plaintiff must 'define the relevant market.'" *Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 442 (5th Cir. 2026) (quoting *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453-54 (5th Cir. 2021)). "The relevant market has two components: a product market and a geographic market." *Rx Sols., Inc.*, 164 F.4th at 442 (quoting *Shah*, 985 F.3d at 454); *Drs. Hosp. of Laredo v. Cigarroa*, 782 F. Supp. 3d 406, 439 (W.D. Tex. 2025). Here, Plaintiffs' proposed product market is the market for CRNA services at inpatient general acute care hospitals. Plaintiffs' proposed geographic market is Jefferson County, Texas. The court agrees that the relevant geographical market is Jefferson County, particularly because of the special need for local CRNAs, who staff the acute care hospitals full-time and must live within 30 minutes of the facility, as opposed to *locum tenens* ("*locum*") CRNAs, who are paid premium wages to travel to certain facilities. The court disagrees, however, that the product market is limited to acute care hospitals. The parties' briefing and the hearing testimony indicate that Jefferson County CRNAs have multiple opportunities to work full time outside of acute care hospitals, including at gastroenterology and orthopedic centers and other outpatient ambulatory surgical facilities. While Plaintiffs may prefer hospital employment over outpatient work, that preference does not negate the availability of such positions. Moreover, the plain terms of the noncompete agreements bar Plaintiffs from providing CRNA services within a 20-mile radius of any facility where they provided CRNA services as an employee of AA—regardless of whether the facility was an acute care hospital or outpatient facility. Thus, these facilities should be included as part of the relevant market in evaluating Plaintiffs' claims.

*See Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1109-12 (N.D. Ohio 2004) (defining the relevant product market as the market for inpatient and outpatient anesthesia services and the relevant geographic market as the area within a 20-minute radius of a particular hospital).

In the case at bar, Plaintiffs argue that the first element of a Section 1 claim, existence of a conspiracy, is met because the employment agreements between the CRNAs and AA satisfy the "concerted action" requirement of a conspiracy claim.[3]  The court agrees.  AA and each of the Plaintiffs is a separate economic actor with competing economic interests.  Moreover, this type of vertical agreement not to compete between employer and employee falls within the purview of Section 1.  *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 856 (1st Cir. 1985) (holding that the doctrine of *in pari delicto* is not recognized as a defense to an antitrust action and affirming that an agreement between a plaintiff and a defendant may serve as the basis of a Section 1 complaint); *In re Vantage Benefits Adm'rs, Inc.*, No. 18-31351-SGJ-7, 2024 WL 3842796, at *21 (Bankr. N.D. Tex. Aug. 14, 2024).  Thus, Plaintiffs are likely to succeed on the first element.

Regarding the second and third elements, restraint on trade in a particular market, Plaintiffs maintain their burden to prove that the noncompete agreements have anticompetitive effects is readily satisfied.  Specifically, Plaintiffs argue that AA's market power has enabled it to restrict artificially the availability of CRNA services in Jefferson County and increase its rivals' costs for CRNA services by hundreds of thousands of dollars as a result of the premium wages required to retain *locum* CRNAs.  Plaintiffs also maintain that the noncompete agreements serve no

---

[3] Notably, AA failed to address the elements of Plaintiffs' prima facie case in any of their briefs, arguing instead that the court lacks jurisdiction to grant the requested injunctive relief under the Anti-Injunction Act.  The court addresses this argument separately below.

procompetitive purpose—they exist purely to restrict the availability of CRNA services and increase prices of those services for AA's competitors.

Employing the rule of reason standard, it appears that Plaintiffs may be able to meet their initial burden.  First, the court finds that AA has significant market power over the CRNA services in Jefferson County.  Although it is challenging to discern exactly how many CRNAs are currently providing anesthesia services in Jefferson County and how many CRNAs work for acute care hospitals versus outpatient facilities,[4] it is clear that AA controls a dominant share of the market, as evidenced by its contracts with the inpatient general acute care hospitals. The question then becomes whether this dominance created a barrier to entry for AA's competitors.  Dr. Callas testified that his contracts with the hospitals were not exclusive, meaning that a window was left open for non-AA employed CRNAs to work at these facilities.  Moreover, the enforcement of Plaintiffs' noncompete agreements does not impede EH and other competitors' ability to recruit CRNAs not bound by AA's noncompete agreements to come live and work in Jefferson County. In fact, EH's higher salary rates for CRNAs should theoretically attract CRNAs not bound by AA's noncompete agreements.  The practical effect of AA's noncompetes, however, has been that EH has struggled to find sufficient CRNA labor to fulfill St. Elizabeth's capacity needs—even at above-market prices.  This struggle has in turn affected major consumers, such as St. Elizabeth. Michele Denman[5] testified that while there have not been any canceled medical procedures as a

_____

[4] The court has been presented with conflicting evidence on this issue.  Defendants maintain that approximately 50 CRNAs are employed at various facilities in Jefferson County, while Plaintiffs aver that only 33 CRNAs worked in Jefferson County in 2025.  AA also claims that it employed only 11 CRNAs with geographically-constrained covenants not to compete whereas Plaintiffs claim there are 12 CRNAs subject to AA's noncompete agreements.

[5] Michele Denman, RN, is the Administrative Director for Perioperative Services at CHRISTUS St. Elizabeth.

13

result of insufficient anesthesia services, she has had to schedule fewer procedures due to the lack of available anesthesia services. Thus, not allowing Plaintiffs to work for EH at St. Elizabeth has reduced surgical capacity, forcing surgeons and patients to delay procedures or take their surgeries to Baptist or the Medical Center of Southeast Texas—Jefferson County's only other acute care hospitals, where AA stands to benefit from increased surgical output. Accordingly, Plaintiffs have shown at least some adverse anticompetitive effect harming a particular consumer, but it is unclear whether this effect is "substantial" across the relevant market.[6]

Even if Plaintiffs have met their burden, AA has alleged a procompetitve rationale for the restraint. The noncompete agreements protect AA's efforts to recruit and retain its CRNAs. The absence of such protection creates a substantial risk that it would lose its CRNA workforce, causing it to be unable to meet its existing contractual obligations, and therefore threatening the existence of its business. Furthermore, the state court has already found that these exact noncompete clauses are likely valid and enforceable under Texas contract law. The burden therefore shifts back to Plaintiffs to show that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means, which they fail to address in their brief. Hence, under these circumstances, it is difficult to assess Plaintiffs' likelihood of success on the merits of their Section 1 claim.

b.    Monopolization

Section 2 of the Sherman Act punishes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part

---

[6] Callas also supports the establishment of a CRNA program at Lamar University in Beaumont, Texas, which further undercuts any inference that he is attempting to exclude competitors from the market and instead reflects a procompetitive effort to increase the supply of CRNAs in Jefferson County.

14

of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. Regarding monopolization claims, "[a] violation of section 2 of the Sherman Act is made out when it is shown that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Abraham*, 776 F.3d at 334 (quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999)).  The crux of the second element is whether a defendant engaged in anticompetitive conduct, meaning "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *BRFHH*, 49 F.4th at 529 (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482-83 (1992)).

Plaintiffs claim that AA engaged in anticompetitive conduct because Dr. Callas brazenly stated under oath that the intent of the noncompete agreements was to maintain AA's monopoly and drive up CRNA prices for others.  Plaintiffs therefore assert that AA's conduct has no rational business purpose other than its adverse effect on competitors.  Moreover, Plaintiffs maintain that AA's monopoly power was obtained through coercive noncompete agreements rather than AA's superior business acumen.  While AA is clearly the dominant supplier of CRNA services in Jefferson County, it is not evident that AA used its power to foreclose competition, gain a competitive advantage, or to destroy a competitor.  Nor is it clear that AA used its dominance to drive up prices for others.  EH's need to hire *locum* CRNAs to replace Plaintiffs can largely be attributable to a nationwide shortage of CRNAs, rather than any intentional anticompetitive conduct by AA.  Although EH cannot hire Plaintiffs bound by the noncompete agreements, nothing prevents it from hiring other full-time CRNAs, without regard to the limited supply of

CRNAs willing to live and work in Jefferson County. Thus, the court is uncertain whether Plaintiffs are likely to succeed on the merits of their monopoly claim at this juncture.

c.   Attempted Monopolization

Attempted monopolization, while similar to actual monopolization, allows for liability even if the monopoly never comes to fruition. *BRFHH*, 49 F.4th at 529. Plaintiffs maintain that they have easily satisfied the less "dangerous probability of achieving monopoly power" standard for attempted monopolization. Again, even if AA held monopoly power in the relevant market, both monopolization and attempted monopolization require a showing of anticompetitive conduct, which does not appear to have been established in this case. As noted above, it is not evident that AA attempted to use its market power to foreclose competition, gain a competitive advantage, or to destroy a competitor. Therefore, the court cannot find that AA is likely to be liable for attempted monopolization at this stage in the litigation.

2.   Anti-Injunction Act

Even if Plaintiffs were likely to succeed on the merits of their claims, the court finds that the Anti-Injunction Act applies in this case, which bars the court from issuing the requested injunctive relief. Under the Anti-Injunction Act ("AIA"), "A court of the United States may not grant an injunction to stay proceedings[7] in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The AIA is "designed to prevent conflict between federal and state courts."

---

[7] At the time the AIA was last amended, the term "proceeding" was defined to include "all possible steps in an action from its commencement to the execution of judgment." *Proceeding*, BLACK'S LAW DICTIONARY (3d ed. 1933); *cf. Proceeding*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "proceeding" as "including all acts and events between the time of commencement and the entry of judgment"). Thus, a preliminary injunction issued by a state court is properly encompassed within the definition of "proceeding."

*United States v. Billingsley*, 615 F.3d 404, 409 (5th Cir. 2010) (quoting *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 225 (1957)).  The AIA "is an absolute prohibition against any injunction of any state-court proceedings, unless the injunction falls within one of the three specifically defined exceptions in the Act." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977).  "The Act does not prohibit only injunctions directed at state courts themselves, but also injunctions directed at private parties when the injunction would prohibit using the results of a state court proceeding."  *Billingsley*, 615 F.3d at 409 (citing *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970)).  "[A]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy."  *Vendo*, 433 U.S. at 630 (quoting *Atl. Coast Line R.R.*, 398 U.S. at 297).

Although the AIA has not been applied in cases presenting precisely these facts, that does not render it inapplicable.  While Plaintiffs do not expressly seek to enjoin a state court proceeding, the relief requested would have the same practical effect.  *See Billingsley*, 615 F.3d at 409-11 (holding the AIA applicable where a preliminary injunction sought in federal court to bar the removal of a footbridge under the Fair Housing Act would conflict with a state court judgment interpreting the meaning of a settlement agreement to require the footbridge's removal).  Specifically, granting a preliminary injunction here would place this court's order in direct conflict with the state court's injunctions, thereby creating the very friction the AIA was designed to avoid.  Moreover, none of the three exceptions applies.  *See Vendo*, 433 U.S. at 627-29 (holding that the injunctive relief provision of the Clayton Act did not constitute an express exception to the AIA, therefore the AIA applied to bar respondents' request for a federal preliminary injunction against

the collection of damages in accordance with an Illinois state court judgment).  In any event, any uncertainty should be resolved in favor of allowing the state court to proceed to final judgment. Therefore, because the AIA bars the injunctive relief requested in Plaintiffs' complaint, which is the relief at issue for purposes of this motion, Plaintiffs are not likely to succeed on the merits of their Sherman Act claims.

> B.    Irreparable Harm

"Federal courts have long recognized that, when 'the threatened harm is more than *de minimis*, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc.*, 762 F.2d at 472 (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)); *accord Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).  An injury is "irreparable" only if it cannot be undone through monetary remedies.  *Enter. Int'l, Inc.*, 762 F.2d at 472 (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)); *accord Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017); *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, No. 2:22-CV-00027-JRG-RSP, 2025 WL 904378, at *2 (E.D. Tex. Mar. 25, 2025).  Thus, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Enter. Int'l, Inc.*, 762 F.2d at 472 (quoting *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975)); *accord Dennis Melancon, Inc.*, 703 F.3d at 279; *Martono-Chai v. Williams*, No. CV 25-578, 2025 WL 974251, at *1 (E.D. La. Apr. 1, 2025).

The loss of opportunity to pursue one's chosen profession can be considered an irreparable harm. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 n.16 (1981); *Burgess*, 871 F.3d at 304. Relying on this principle, Plaintiffs argue that their inability to practice their trained profession in Jefferson County and the loss of opportunities to find comparable employment constitute irreparable harm. The vast majority of cases in which courts have found irreparable harm on this basis, however, involve circumstances where the plaintiff was barred from practicing his or her chosen profession altogether, either statewide or nationwide. *See, e.g.*, *Enyart v. Nat'l Conf. of Bar Exam'rs., Inc.*, 630 F.3d 1153, 1165-66 (9th Cir. 2011) (finding irreparable harm based on loss of opportunity to pursue chosen profession where failure to meet licensing requirements would preclude plaintiff from practicing law in California); *Giri v. Nat'l Bd. of Med. Exam'rs.*, 718 F. Supp. 3d 30, 44 (D.D.C. 2024) (finding irreparable injury where the invalidation of medical students' licensing exam scores would make them ineligible to participate in the Match program and thus ineligible for a medical license in many jurisdictions); *Portee v. Morath*, 683 F. Supp. 3d 628, 636 (W.D. Tex. 2023) (finding irreparable harm where Texas education officials refused to recognize plaintiff's out-of-state counselor license, preventing her from working as a licensed guidance counselor in Texas, and noting that compensatory damages were neither sought nor available due to sovereign immunity). Moreover, a review of the authorities cited by Plaintiffs in support of this factor reveals that the case at bar is clearly distinguishable.

In *Burgess v. Federal Deposit Insurance Corporation*, an analogous case cited by Plaintiffs, plaintiff Cornelius Campbell Burgess ("Burgess"), a director and former officer of Herring Bank, was investigated by the FDIC for improper expense practices and misuse of bank property. 871 F.3d at 299. An FDIC Administrative Law Judge conducted a hearing and issued recommended

19

findings of fact and conclusions of law, which the FDIC Board largely adopted in an order assessing a civil penalty against Burgess. *Id.* The order also required Burgess's withdrawal from the banking industry. *Id*. Burgess then sought review in the district court, challenging the constitutionality of the FDIC's adjudication, and moved for a preliminary injunction to stay the FDIC's order pending resolution of his petition. *Id.* In granting the preliminary injunction, the Fifth Circuit found that Burgess had demonstrated an irreparable injury because he had "established a likelihood of success on the merits . . . and will be left unable to find employment in the banking industry so long as the FDIC's order remains in place." *Id.* at 304.

While the court agrees that the inability to obtain comparable employment may constitute irreparably injury in certain situations, the instant case differs from *Burgess* in material respects. Importantly, the noncompete clauses do not categorically bar Plaintiffs from providing CRNA services altogether. Rather, absent the court's grant of an injunction, Plaintiffs may still feasibly live in Jefferson County and travel to surrounding cities such as Houston, Texas, Baytown, Texas, and Lake Charles, Louisiana, to practice as a CRNA. Additionally, the noncompete agreements are effective for only a three-year period immediately following the termination of employment with AA. Thus, unlike Burgess, Plaintiffs are still able to practice their chosen profession and are prohibited from practicing in a certain area for only a limited time period.

Plaintiffs also cite *Villas at Parkside Partners v. City of Farmers Branch* for the proposition that uncertainty regarding relocation and changing jobs are irreparable harms that cannot be remedied with monetary damages. 496 F. Supp. 2d 757, 776 (N.D. Tex. 2007). The court, however, does not find Plaintiff's argument persuasive. In *Villas at Parkside Partners*, owners and tenants of apartment complexes brought action challenging a city ordinance requiring

20

tenants to supply evidence of citizenship or eligible immigration status for each tenant as prerequisite for entering into a lease. *Id*. at 761-62. The ordinance included criminal penalties for violation, specifically stating that "any person violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $500 and a separate offense shall be deemed committed upon each day during or on which a violation occurs or continues." *Id.* at 763. The plaintiffs moved for a preliminary injunction to enjoin the effective date and enforcement of the ordinance, arguing, *inter alia*, that it was unconstitutional. *Id*. at 764. In finding that the plaintiffs would suffer irreparable injury absent a preliminary injunction, the court noted that the ordinance created uncertainty for the tenant plaintiffs with regard to legal aliens without sufficient documentation, opining that the "uncertainty is likely to require the tenant plaintiffs to relocate, change jobs and school, or remain in Farmers Branch and face eviction, all harms that may not be remedied by monetary damages."

Here, in contrast to the *Villas at Parkside* tenants, Plaintiffs are not facing forced eviction, displacement, or existential uncertainty under threat of criminal penalties. Plaintiffs remain free to live in Jefferson County, practice their profession outside of the restricted geographical area for the relevant time period, and recover monetary damages for any alleged loss of salary. Further, unlike the *Villas at Parkside* tenants, who were subject to the ordinance by operation of law and faced eviction without any action on their part, Plaintiffs voluntarily entered into their noncompete agreements and subsequently chose to terminate their employment with AA. Moreover, the plaintiffs in *Burgess* and *Villas at Parkside Partners* demonstrated a likelihood of success on the merits, whereas Plaintiffs here have not definitively made such a showing with respect to their

21

claim for injunctive relief. Thus, the cases cited by Plaintiffs are factually distinguishable and inapplicable to the case at hand.[8]

Additionally, as AA points out, Plaintiffs are all continuing to receive their salaries from EH, which are approximately $320,000 per year, despite the fact that they may be working full-time or part-time outside the 20-mile radius, or not at all. During the hearing, Colby LaFleur, President of the Eastern Division for EH, indicated that the agreements with Plaintiffs would either need to be modified or terminated by May 1, 2026. Nevertheless, any alleged injury remains speculative. *See Ryan LLC v. Fed. Trade Comm'n*, 739 F. Supp. 3d 496, 516-17 (N.D. Tex. 2024) ("[A] showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011)). Even if EH ultimately terminates the agreements, Plaintiffs' injuries would be compensable through monetary damages. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury"); *Ben-Yonatan v. Concordia Coll. Corp.*, 863 F. Supp. 983, 986 (D. Minn. 1994) ("The harm [the plaintiff] alleges is the loss of one year compensation as a medical doctor, a harm which is clearly compensable by monetary damages.").

The court also agrees with AA that complaints of being unable to attend children's dance recitals, that spouses may have increased domestic duties, or that there will be general strain on the family, are not harms properly rectified by a preliminary injunction. In addition to being

---

[8] Plaintiffs also rely on *Valley v. Rapides Parish School Board*, but that case is likewise distinct, as there is no allegation here that Plaintiffs' reputations are at stake. 118 F.3d 1047, 1056 (5th Cir. 1997) (finding that the defendant Board's "biased finding of inefficiency and incompetency" during an "egregious and constitutionally infirm hearing" inflicted such severe reputational injuries to plaintiff that her ability to procure comparable employment was threatened).

speculative, the aforementioned harm is not cognizable under the Sherman Act, which does not provide for the recovery of emotional damages. *See Chicago Tchrs. Union, Loc. 1 v. Educators for Excellence, Inc.*, 159 F.4th 524, 530 (7th Cir. 2025) ("[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." (quoting *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974)); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (noting that, to obtain injunctive relief, an injury must be of the type antitrust laws were designed to prevent); *Roberson v. Kansas City S. Ry. Co.*, 616 F. Supp. 3d 928, 941-42 (W.D. Mo. 2022) (holding that pain and suffering from being forced to work and not having FMLA leave was not an irreparable injury because the FMLA does not provide a remedy for emotional distress).  Indeed, these are the ordinary challenges of countless Americans who commute or travel for work, often for a fraction of the compensation afforded to Plaintiffs.  While the current commuting arrangements may be inconvenient, the restraints are limited in time, and such inconvenience does not rise to the level of irreparable harm.  Moreover, Plaintiffs' substantial compensation mitigates these concerns, as it affords them the ability to obtain assistance in handling their family responsibilities.

AA further argues that there is no irreparable harm because Plaintiffs have delayed seeking relief.  Specifically, AA notes that four months have passed from the time the temporary injunction orders were entered against the DuBois plaintiffs until this motion was filed.  While the length of a plaintiff's delay is not alone determinative in assessing whether he or she will be irreparably harmed, it may still weigh against the immediacy of the harm.  *See VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d 722, 730 (N.D. Tex. 2022) (noting that "length of

23

time alone is not dispositive given that any determination of a movant's timeliness seems to turn on the facts of the particular case"). While Plaintiffs' delay does not, standing alone, negate a finding of immediacy, it raises questions as to their decision to defer seeking injunctive relief under antitrust law. That concern is heightened by the fact that Plaintiffs initiated this suit only after the state court issued injunctions against them, suggesting an attempt to obtain a second bite at the apple.[9] In any event, no adequate showing has been made that Plaintiffs will be irreparably injured absent a preliminary injunction.

Plaintiffs additionally argue that an injunction is necessary to prevent irreparable harm to market competition. Plaintiffs aver that harm to competition in and of itself constitutes irreparable injury because competition cannot be restored by monetary damages. Here, Plaintiffs maintain that the noncompetes harm competition by cutting off the availability of CRNAs in the relevant market and preventing them from competing with AA. The authority cited by Plaintiffs, however, as AA points out, deals primarily with violations of the Clayton Act, which is not at issue here.[10] Additionally, Plaintiffs' exclusion from the market arises solely from the noncompete agreements they voluntarily executed. The state court has already determined that those agreements are likely

---

[9] In fact, Plaintiffs' answer in the DuBois state court litigation refers to violations of state and federal antitrust laws.

[10] Although similar, the Clayton and Sherman Acts are nonetheless distinguishable. *See* Richard M. Steuer, *Incipiency*, 31 LOY. CONSUMER L. REV. 155, 163 (2019) ("[T]he Clayton Act has a broader reach than the Sherman Act"); Fiona Scott Morton & Herbert Hovenkamp, *Horizontal Shareholding and Antitrust Policy*, 127 YALE L.J. 2026, 2034 (2018) ("Section 7 [of the Clayton Act] bases illegality on proven 'effects'--namely, when 'the effect of such acquisition . . . may be substantially to lessen competition.'"); *see also United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 21 (D.D.C. 2022) (noting that the Clayton Act's merger and acquisitions provisions prohibit conduct that substantially lessens competition).

valid under state law. It does not follow that every such agreement, simply because it restricts a party's ability to compete, constitutes a violation of the antitrust laws. To the contrary, that is the ordinary function of a noncompete—to limit participation in a defined product and geographic market for a specified period of time. Moreover, "[t]he antitrust laws were enacted for the protection of *competition*, not *competitors*." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)). The court therefore finds that Plaintiffs have not met their burden to demonstrate a risk of irreparable harm.

C.     Balancing of Equities

To meet the balancing of the equities factor, a plaintiff must establish that his or her irreparable harm is greater than the hardship that the preliminary injunction would cause Defendants. *Winter*, 555 U.S. at 20. Plaintiffs argue that they will suffer substantial and irreparable injury in the absence of an injunction, but that AA will suffer none should a preliminary injunction issue. AA, on the other hand, contends that if the noncompete clauses were not enforced, AA faces the possibility of losing additional CRNAs to competitors, which could render it unable to fulfill the ongoing contractual anesthesia requirements for other medical facilities in the area. Thus, the consequence of losing those professionals from its practice could threaten the survivability of its business. Balancing the equities, the court finds that AA would suffer greater hardship if the preliminary injunction were issued in this case. Granting a preliminary injunction would effectively invalidate AA's noncompete agreements, creating a substantial risk that it would lose its CRNA workforce and, in turn, be unable to meet its existing contractual obligations. In contrast, the court has already determined that Plaintiffs are unable to

25

show that they will be irreparably harmed absent an injunction. Thus, the balancing of equities tips strongly in favor of AA.

D.    Effect on Public Interest

The effect on public interest is the final factor a court considers in evaluating whether to grant or deny a preliminary injunction. *Tex. First Nat'l Bank*, 347 F. Supp. 2d at 400 (citing *DSC Commc'ns Corp.*, 81 F.3d at 600). With regard to this factor, the court must weigh the public interests that might be injured and the public interests that might be served by granting or denying a preliminary injunction. *Sierra Club v. U.S. Army Corps of Eng'rs.*, 645 F.3d 978, 997-98 (8th Cir. 2011); *Louisiana v. U.S. Dep't of Educ.,* 737 F. Supp. 3d 377, 409 (W.D. La. 2024). Plaintiffs argue that a preliminary injunction is in the best interest of the patients of Jefferson County because Plaintiffs are currently prohibited from providing essential health care services to numerous patients due to their noncompete agreements. Further, Plaintiffs point out that the money CHRISTUS is paying to have *locum* CRNAs provide coverage could be used elsewhere to actually enhance care. AA counters that the evidence shows patient care has continued without adverse impact and that officials from CHRISTUS have described EH's anesthesia coverage at St. Elizabeth's as excellent.

Here, this final factor weighs in favor of Plaintiffs. To the extent any cognizable injury arises from the enforcement of the noncompete agreements, the harm falls on the public. As the only Level III trauma center in Jefferson County, inadequate staffing at St. Elizabeth could delay emergency care and compromise public safety. Although AA is correct that there is no evidence of canceled surgeries, a reduction in available CRNA services necessarily results in fewer surgeries being scheduled. Ms. Denman testified that the addition of seven CRNAs to her staff

26

would open up the currently restricted surgery schedule. In addition, even though the demand for CRNAs at St. Elizabeth may have decreased following the departure of the two physician groups, Mr. Trevino testified that St. Elizabeth's inability to access seven CRNAs means that the hospital cannot open all of the available operating rooms, which causes strain on the system. Thus, the health of the community has been put at risk as a result of the noncompete agreements, which will weigh heavily against any interest of the parties that might be served by the issuance or denial of an injunction.

While the last factor may weigh in favor of Plaintiffs' request for a preliminary injunction, the other three factors militate against the issuance of such injunction. Therefore, the court declines to grant Plaintiffs' requested relief.

III.    Conclusion

Having found that Plaintiffs cannot show a likelihood of success on the merits, irreparable injury, or that the balance of equities tips in their favor, the preliminary injunction factors weigh against granting the injunction. Furthermore, the AIA precludes the court from granting such relief in this case, as the requested injunction would directly conflict with injunctions issued by the state court in the parties' state court litigation. Therefore, Plaintiffs' Motion for a Preliminary Injunction (#8) is DENIED.

SIGNED at Beaumont, Texas, this 8th day of April, 2026.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE